**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| FRANK MOBILIO, | : | |
| | : | |
| Plaintiff, | : | **OPINION** |
| | : | |
| v. | : | Civ. No. 07-3945 (WHW) |
| | : | |
| THE DEPARTMENT OF LAW AND PUBLIC SAFETY OF THE STATE OF NEW JERSEY, THE DIVISION OF NEW JERSEY STATE POLICE, DETECTIVE LONG, JOHN DOE 1-5 AND MARY DOE 1-5, | : : : : : : | |
| | : | |
| Defendants. | : | |

**Walls, Senior District Judge**

   Plaintiff, Frank Mobilio, filed this lawsuit against Defendants, Brian Long ("Detective Long"), the Division of Law and Public Safety of the State of New Jersey ("NJ Division of Safety"), the Division of New Jersey State Police ("NJ State Police") and John Does 1-5 and Jane Does 1-5 (collectively, the "Defendants"), alleging that they violated his rights by arresting him without probable cause and starting a criminal prosecution against him without any basis. On July 7, 2008, this Court dismissed Plaintiff's complaint against all defendants in their official capacities, the NJ Division of Safety, and the NJ State Police; and dismissed Count Four (false arrest) with prejudice and Count Five (civil rights violations) without prejudice. Defendants now move for summary judgment asking the Court to dismiss the remaining counts in this action. Plaintiff opposes Defendants' motion and asks the Court to reinstate Count Five.

**NOT FOR PUBLICATION**

Pursuant to Fed. R. Civ. P. 78, the Court decides the motion without oral argument. Defendants'

motion for summary judgment is granted. Plaintiff's motion to reinstate Count Five is denied.

## FACTS AND PROCEDURAL HISTORY

### I.     Investigation of Alleged Sexual Assault

On October 12, 2003, Plaintiff and two male friends, Albert Bosma and Raymond

Eagles, went to a New York Jets football game at Giants Stadium along with two juvenile

females, aged ten and thirteen. The ten-year old girl (with the initials "M.F.") was the daughter

of Plaintiff's friend, a season ticket holder unable to attend the game. The thirteen-year old girl

(with the initials "K.A.") was the next-door neighbor and friend of the ten-year old girl.

On October 13, 2003, K.A went with her stepmother and father to the Sussex

Station of the New Jersey State Police (the "Sussex Station") and alleged that Plaintiff had

sexually assaulted K.A. during the previous day's trip. In a written statement, K.A.'s stepmother

reported that, the previous night, "[K.A.] came down and asked if she could talk to me . . . . she

began sobbing and told me that something happened at the game. . . . She then told me that at the

game, Mr. Mobilio was touching her leg and her private area, and that he kept trying to hold her

hand. . . . She then made an excuse to go to the bathroom and both girls turned around and asked

[Mr. Eagles] to take them to the bathroom. . . . [M.F.] said that she saw Frank [Mobilio] touching

[K.A.] and she was scared. They were both asking each other what to do. . . . **On** the drive

[home], Frank stated that he had to go to the bathroom . . . . After returning to **the** car . . . . Frank

got in the back seat . . . . Frank then unzipped his pants and opened them, exposing himself, and

then covered it with his jersey (shirt). He placed his foot up on the seat with his elbow on his

-2-

**NOT FOR PUBLICATION**

knee so [M.F] could not see. . . . He proceeded to rub [K.A.'s] leg and private area on the outside

of her pants and then persisted at trying to get into her pants. . . . He put his hand under her shirt

and under her bra and fondled her breasts . . . . He repeatedly pulled her hand onto his crotch and

pressed her hand into his exposed penis. . . . [H]er hand got something wet on it so she thought

he peed on her.  When she was able to get her hand away, she wiped it on her jeans . . . . I asked

[M.F.] to tell me what she saw . . . . After hearing [M.F.] and [K.A.] tell virtually the same story,

both with terrified looks, [my husband] and I weighed all that we heard and decided that we had

to seek criminal charges." (Ex. H.)  K.A's stepmother gave to the detectives the jeans that K.A.

had worn the previous day at the football games.  (Ex. A.)

    Detective Frank Cruz and Detective Kim Unhoch then spoke with K.A.  At

4:31 p.m., K.A. stated the following in a taped sworn statement:  on October 12, during the

second quarter of the New York Jets football game, "Frank [Mobilio] started touching my leg

and I like kinda felt uncomfortable and so I asked [M.F.] to come out to the bathroom with

me. . . . Then [M.F.] was keeping her eye on him and he started feeling the inside of my inner

thigh, and near my private area and [M.F.] saw all this and kinda panicked and so did I we were

both really scared. . . . [F]ive minutes before [the game] ended he told [M.F. and me] to come

outside with him . . . . [H]e was like still acting funny and he is trying to hold my hand . . . . He

was sitting in the middle [on the car ride home]. . . . [A]nd he like started to touch my leg, inside

my like inner thigh. . . . [A]nd then he un-zippers his pants and he gets my hand and he pulls it

towards his privates . . . . He was just sitting straight but with his elbows like on his knees so he's

blocking [M.F.'s] view from seeing anything that happens. . . . He took my wrist and he placed it

-3-

**NOT FOR PUBLICATION**

on his private. . . . I felt something wet in my hand and at first I was thinking sperm but like I wasn't exactly sure because I looked at my hand and it wasn't white. . . . [H]e went up my shirt and under my bra. . . . [Mr. Eagles and Mr. Bosma in the front seats] were just talking about the game . . . having their own conversation. . . . [That night] I went to [my stepmother] crying and told her I couldn't breath I was crying so hard. . . . I told her everything . . . " (Ex. D.)

After taking K.A.'s sworn statement, Detective Cruz and Detective Unhoch went to Plaintiff's home and informed him that they wished to speak with him. Plaintiff followed the detectives to the Sussex Station. The detectives read Plaintiff his Miranda rights and interviewed him. According to Detective Cruz's police report describing the interview: "[Detective Cruz] advised Mr. Mobilio one of the girls made a complaint that he touched her inappropriately. Mr. Mobilio did not deny this or ask me who made the complaint. He appeared visibly nervous and his lips started to quiver. . . . Det. Unhoch then asked him what he would say if she told him that [K.A.] stated that he touched her breast from underneath her shirt and bra. He did not deny this, instead, he stated, 'I would say that's absurd.' During this time, Mr. Mobilio began to constantly run his fingers through his hair and appear extremely nervous. . . . [Detective Cruz] then asked Mr. Mobilio if he in fact did any of the things [K.A.] said. . . . He stated, 'no' and that he wanted to stop. This concluded our interview of Mr. Mobilio." (Ex. A.)

On October 14, 2003, Detective Long was assigned to the investigation, and he reviewed K.A.'s sworn taped statement. (Pl. Ex. 3 at 42-43; Ex. F.) Detective Long asked Albert Bosma and Ray Eagles to report to the Sussex Station. (Ex. F) Mr. Bosma arrived at the police station at 6:19 p.m. At 6:50 p.m., Mr. Bosma signed a Miranda card. Detective Long and

-4-

**NOT FOR PUBLICATION**

Detective Neil Hickey then interviewed **Mr.** Bosma. Detective Long took handwritten notes during the interview. (Ex. S at 12-13; Pl. Ex. 2.)

Later in the evening, Detective Ingrid DeLisa of the Sussex County Prosecutor's Office joined Detective Long and Detective Hickey. At 8:20 p.m., Mr. Bosma gave a taped sworn statement to the three detectives. (Ex. B.) On tape, Detective DeLisa read Mr. Bosma his Miranda warnings and placed him under oath. Mr. Bosma then gave the following testimony in his taped sworn statement: on October 12, 2003, Mr. Bosma and Mr. Eagles drove to the football stadium with Plaintiff and the two juvenile girls. In the parking lot before the game started, Plaintiff commented to Mr. Bosma that M.A. "had big breasts . . . she was a hot looking number and . . . he wouldn't mind doing her." Mr. Bosma observed Plaintiff "hugging" K.A. before they had entered the stadium, and "rubbing her leg a little bit now and then . . . [on] her thigh area" during the game. On the car ride home, Plaintiff was initially in the front right passenger seat, but after a restroom break, Plaintiff switched seats with Mr. Eagles and sat between the two girls in the back of the car. During the car ride, Mr. Bosma observed Plaintiff "pulling down his pants and taking [K.A.'s] hand and rubbing it on his . . . private parts." Afterward, Mr. Bosma observed that K.A. "took her hand and rubbed it on her pants, on her upper pant leg." At that point, Mr. Bosma "imagined" that Plaintiff had "ejaculated" and that K.A. was taking his semen and rubbing it on her pants. Mr. Bosma also observed Plaintiff's hand to be touching K.A.'s breasts. Mr. Bosma saw Plaintiff the night after the game, and Mr. Bosma "knew" that Plaintiff was "guilty." Mr. Bosma stated that he was not threatened to

**NOT FOR PUBLICATION**

provide the information he gave in his statement, and that no promises were made to him to give

that information.  (Ex. B.)

Meanwhile, as Detective Long, Detective Hickey, and Detective DeLisa were

interviewing Mr. Bosma, other detectives interviewed Ray Eagles.  Those detectives did not read

Mr. Eagles his Miranda warnings before interviewing him.  At 8:13 p.m., Mr. Eagles gave a

sworn taped statement.  (Ex. C.)  In the statement, Mr. Eagles stated the following:  on

October 12, before entering the football stadium, Mr. Eagles saw Plaintiff and K.A. "briefly

holding hands" which Mr. Eagles thought was "kind of odd."  Also in the parking lot, Mr. Eagles

heard Plaintiff comment that K.A. was "developed for her, a twelve year old."  Near the

beginning of the car ride home, Mr. Eagles saw Plaintiff take a towel and lay it over K.A.'s leg,

which Mr. Eagles thought was "kind of peculiar."  (Ex. C.)

In the morning on October 15, 2003, Detective Hickey delivered the jeans that

K.A. had worn to the football game to the New Jersey State Police Central Regional Laboratory

for testing.  (Ex. R.)  The state police lab issued a report, dated October 15, 2003, finding that no

seminal material was detected on the jeans.  (Pl. Ex. 4.)  Plaintiff contends that a reasonable jury

could infer that Detective Long knew about the results on October 15, 2003.  (Pl. Opp'n at 7.)

Defendants contend that Detective Long did not receive the results until October 30, 2003.  (Def.

Statement of Undisputed Material Facts ¶ 78.)

On October 15, 2003, at about 9:00 a.m., Detective Long called Mr. Bosma on the

telephone and asked him in which county the alleged assault took place.  Mr. Bosma told

Detective Long that he believed that the car was in Sussex County when the assault took place.

NOT FOR PUBLICATION

## II.    Affidavit of Probable Cause

On October 15, 2003, Detective Long, assisted by Detective Unhoch with the paperwork, drafted an Affidavit of Probable Cause (the "Affidavit") to obtain warrants to arrest Plaintiff and search his home and vehicle.  The Affidavit had four enumerated paragraphs noting that:  (1) K.A.'s stepmother went to the Sussex Station on October 13 and reported that Plaintiff had sexually assaulted her stepdaughter the previous day; (2) K.A. gave a taped sworn statement describing how Plaintiff had sexually assaulted her; (3) Mr. Bosma gave a taped sworn statement recounting his observations from October 12; and (4) Ray Eagles gave a sworn taped statement recounting his observations from October 12.  (Ex. M.)  The third paragraph in the Affidavit, which described the information that Mr. Bosma provided in his statement, was the lengthiest paragraph in the Affidavit.  The third paragraph accounted for 45 of the Affidavit's 78 lines.

On the basis of the Affidavit, on October 15, 2003, New Jersey Superior Court Judge N. Peter Conforti issued warrants to arrest Plaintiff (on the charges of endangering the welfare of a child and criminal sexual contact) and search Plaintiff's property.  That evening, Detective Long and six other law enforcement officers served these warrants and arrested Plaintiff.  The law enforcement officers also searched Plaintiff's home and automobile.

On October 16, 2003, Detective Long and Detective Enoch spoke with M.F. and her mother.  M.F. told the detectives that she observed Plaintiff touching and rubbing K.A. "right behind her leg" during the October 12 football game, and she observed Plaintiff "holding hands" with K.A. after the game.  M.F. also told the detectives that she heard a "zipper" and observed Plaintiff touching M.F.'s "thigh" during the car ride home.  (Ex. E.)

-7-

**NOT FOR PUBLICATION**

### III.    Mr. Bosma's Recantation of His Sworn Statement

On February 4, 2005, Mr. Bosma and his attorney met with Detective Unhoch and Sussex County Assistant Prosecutor Francis Koch and informed them that Mr. Bosma needed to change his October 14, 2003 sworn statement.  Mr. Bosma told Detective Unhoch and Prosecutor Koch that he did not see Plaintiff inappropriately touch K.A. on October 12, and that certain information he had presented as his own observations was actually information told to him by others.  Mr. Bosma said he had felt pressured to make the October 14, 2003 statement.  (Ex. T.)

On April 8, 2005, Mr. Bosma and his attorney met with Detective Unhoch and Lieutenant Diane Hemscot to give another statement clarifying his October 14, 2003 statement.  (Ex. U.)  In his April 8 taped sworn statement, Mr. Bosma said that he had felt pressured to cooperate with the criminal investigation and therefore stated in his October 14, 2003 statement that he witnessed certain things between Plaintiff and K.A. that were actually told to him by the mother of M.F.  (Ex. T.)

### IV.    Criminal Trial of Plaintiff

On April 14, 2005, Plaintiff was indicted by a grand jury on charges of criminal sexual contact and engaging in sexual conduct which would impair or debauch the morals of a minor.  The grand jury was told that the state police lab found that none of Plaintiff's seminal fluids or urine was detected on the victim's jeans.  (Def. Ex. 1 at 30-31.)  The grand jury was also told that Mr. Bosma originally told investigating detectives that he had witnessed certain things that he in fact did not witness.  (Def. Ex. 2 at 18.)  Even so, the grand jury returned an indictment.

**NOT FOR PUBLICATION**

Plaintiff was tried on these charges before a jury. During the trial, Mr. Bosma was

called by the State as a witness. Mr. Bosma gave the following testimony on cross-examination:

Q. Before you went to the State Police Station?
A. Yes.
Q. You weren't a suspect, right?
A. No.
Q. But when you arrived at the State Police station, they gave you your Miranda
    warnings. Isn't that right?
A. Yes.
Q. And, Detective Long was in your face, wasn't he?
A. Yes.
Q. And you kept saying, that's not what I saw, and he made you say what you
    said. Isn't that right?
A. Yes.
. . .
Q. Didn't [Detective Long] say that if you didn't say what – if you didn't say
    what he wanted you to say, you were going to be arrested. Isn't that right?
A. Yes.
. . .
Q. So, you were actually pressured in giving that statement, weren't you?
A. Yes, I was.

Pl. Ex. 1 at 32, 34.

Detective Long was also called by the State as a witness during Plaintiff's

criminal trial. On direct examination, Detective Long testified that he only wanted Mr. Bosma to

tell the truth:

Q. [A]t any time [on October 14, 2003], did you threaten [Mr. Bosma]?
A. Absolutely not.
Q. Did you tell him in any way that he needed to tell you the truth?
A. Yes.
Q. And . . . What made you ---
A. Well, we were conducting a State Police investigation. And, therefore, as a
    result, the person that's involved in the investigation needs to cooperate. Or
    try to cooperate. And tell us the truth. And that's – all I was asking him to
    do.
. . .

**NOT FOR PUBLICATION**

> Q.    [D]id you ask him whether he felt threatened or coerced in any way?
> A.    Yes.
> Q.    And, what were his answers to that?
> A.    He did not feel threatened or coerced in any way.

Pl. Ex. 3 at 46-47.  Detective Long testified that he does not think he hoped to get anything from Mr. Bosma's statement, and he was "just trying to get to the truth." (Pl. Ex. 3 at **68**.)  Detective Long agreed that Mr. Bosma's statement was a "substantial" part of his Affidavit of Probable Cause. (Pl. Ex. 3 at 60.)

On October 19, 2006, Plaintiff was acquitted of the charges after a trial by jury.

**V.    The Current Action**

On August 16, 2007, Plaintiff filed his complaint in this action.  Plaintiff alleged malicious prosecution as a civil rights violation (Count One), malicious prosecution as a tort (Count Two), abuse of process (Count Three), false arrest (Count Four), civil rights violations (Count Five), and emotional distress (Count Six).  On July 7, 2008, the Court issued an Order dismissing Count Four (false arrest) with prejudice and Count Five (civil rights violations) without prejudice, and denying Defendants' motion to dismiss the other claims. (Ex. V.)

Detective Long was deposed in this action on November 14, 2008.  Detective Long testified that he did not ever threaten Mr. Bosma. (Ex. S at 14.)  Detective Long testified that he did not know, at the time he submitted his Affidavit, that the state police lab had found that Plaintiff's seminal fluids were not detected on the victim's jeans. (Ex. S at **19**.)  Detective Long testified that, sometime after arresting Plaintiff, he became aware that the lab report was negative. (Ex. S at 24.)

-10-

**NOT FOR PUBLICATION**

Mr. Bosma was deposed in this action on December 18, 2008. At the deposition, Mr. Bosma testified that, on October 14, 2003, he "felt threatened" when speaking with the investigating detectives because they were "yelling and screaming and scaring" him. (Ex. W at 41.) Mr. Bosma testified that on the way to the police station he felt that he did not do anything wrong because he did not know anything about what had happened. (Ex. W at 78.) He initially told the detectives before giving his taped sworn statement that he "really didn't see anything." He ultimately provided false information because he felt "intimidated." (Ex. W at 92.) Mr. Bosma testified that Detective Long got in his face and the detectives said it appeared he could be subject to arrest for not stopping or aborting the alleged crime. (Ex. W at 39-41, 92.)

Mr. Bosma testified that, although he was concerned "about going to jail and stuff" when he spoke with the detectives on October 14, 2003, the detectives did not pressure him to provide false information:

> Q. At the time you were placed under oath and gave your sworn statement, did you observe any of the officers do anything or did you hear any of the officers doing anything that you perceived to be a prompt to say things that were not true?
> A. Like you are asking me if they were coaxing me to make a wrong statement?
> Q. Yes, right.
> A. No.
> Q. When I say "anything," I mean did they move their eyes in a certain way, did they throw their shoulders; did they make hand gestures did they lift their – anything at all – that was what you perceived to be a prompt on their part, a direction for you to give a false statement?
> A. Are you asking me if they did anything?
> Q. Yes.
> A. No, absolutely not.
> . . .
> Q. From the time of the sworn statement on October 14th to the three officers up until that [time] you recanted that statement . . . did you have any information

NOT FOR PUBLICATION

or knowledge that any of those officers knew you were giving false statements in that sworn statement on October 14th?
A. No.
. . .
Q. They [the detectives] did not tell you what to say, did they?
A. No.
Q. And they didn't prompt you as to what to say either before you were sworn in or after you were sworn in, did they?
A. No.
. . .
Q. Was there ever any kind of agreement between you and the two detectives . . . that you were going to give testimony that was either untrue or false in order to assist in the arrest of Mr. Mobilio?
A. No.
Q. Was anything like that ever hinted at or discussed by any of those two officers?
A. Never.
Q. Did you ever perceive . . . that they wanted you to testify in a false manner in order to aid in the arrest and conviction of Mr. Mobilio?
A. No.
Q. The choice to give false information, was that yours?
A. Yes.

Ex. W at 54-56, 89-91. Mr. Bosma testified that the police officers knew what he would say on the tape because, before the tape was turned on, he told them the same things that he said on tape. (Ex. W at 85-86.) Mr. Bosma said that he gave the same untrue statement when the detectives first interviewed him as he did in his sworn taped statement. (Ex. W at 87.)

Mr. Bosma explained that, when he gave his October 14, 2003 statement, he personally believed that Plaintiff committed the alleged crime because he believed that the two girls "wouldn't lie." (Ex. W at 50.) Although much of the information he provided in that statement was provided to him by M.F.'s mother, he did observe "certain little things [on October 12] like [Plaintiff] . . . went into the game with [the two girls]. And he went [left the game] ahead of time. And he insisted on them going with him and he held [K.A.'s] hand."

**NOT FOR PUBLICATION**

(Ex. W at 51.) Mr. Bosma testified that he heard Plaintiff comment on K.A.'s breasts. (Ex. W at 51.) Mr. Bosma testified that he first had knowledge that there may have been "trouble" between Plaintiff and K.A. at the football game when M.F.'s mother called him on the evening of October 12, 2003 to inform him that M.F. had told her that Plaintiff touched K.A. inappropriately that day. (Ex. W at 16-17.)

Defendants now move for summary judgment asking the Court to dismiss with prejudice the remaining counts in this action. Plaintiff opposes Defendants' motion and asks the Court to reinstate Count Five (civil rights violations) of the complaint.

## STANDARD OF REVIEW

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56©. A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant and it is material **if**, under the substantive law, the dispute would affect the outcome of the suit. See id. at 248. The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof. See Celotex v. Catrett, 477 U.S. 317, 318 (1986).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts in

**NOT FOR PUBLICATION**

question." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). To

survive a motion for summary judgment, a nonmovant must present more than a mere scintilla of

evidence in his favor. <u>Woloszyn v. County of Lawrence</u>, 396 F.3d 314, 319 (3d Cir. 2005). The

opposing party must set forth specific facts showing a genuine issue for trial and may not rest

upon the mere allegations or denials of its pleadings. <u>Shields v. Zuccarini</u>, 254 F.3d 476, 481 (3d

Cir. 2001). At the summary judgment stage the court's function is not to weigh the evidence and

determine the truth of the matter, but rather to determine whether there is a genuine issue for

trial. <u>See</u> <u>Anderson</u>, 477 U.S. at 249. In doing so, the court must construe the facts and

inferences in the light most favorable to the non-moving party. <u>Curley v. Klem</u>, 298 F.3d 271,

277 (3d Cir. 2002). Upon a motion for summary judgment, the non-moving party, to prevail,

must "make a showing sufficient to establish the existence of [every] element essential to that

party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp. v.</u>

<u>Catrett,</u> 477 U.S. 317, 322 (1986).

## DISCUSSION

Defendants move for summary judgment on the four remaining claims in this

action: malicious prosecution as a civil rights violation (Count One); malicious prosecution as a

tort (Count Two); abuse of process (Count Three); and emotional distress (Count Six).

NOT FOR PUBLICATION

## I.    Malicious Prosecution as a Civil Rights Violation and a Tort

Plaintiff brings two malicious prosecution claims, one as a "Civil Rights violation" under 42 U.S.C. § 1983 and the other "as a Tort." In its relevant part, section 1983 states:

> Every person, who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

42 U.S.C.A. § 1983. To prevail on a section 1983 claim for malicious prosecution as a civil rights violation, a plaintiff must show that: "(1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in his favor; (3) the defendant initiated the proceeding without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." Johnson v. Knorr, 477 F.3d 75, 81-82 (3d Cir. 2007). To prevail on a claim for malicious prosecution as a tort, New Jersey law requires that a plaintiff show "that the criminal action was brought without probable cause, that it was actuated by malice, that plaintiff suffered a special grievance, and that the criminal proceedings terminated favorably to the plaintiff." Rubin v. Novack, 248 N.J. Super. 80, 82 (App. Div. 1991).

Probable cause is an absolute defense to a claim of malicious prosecution under state and federal law. "Probable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to

**NOT FOR PUBLICATION**

believe that an offense has been or is being committed by the person to be arrested." Merkle v.

Upper Dublin Sch. Dist., 211 F.3d 782, 788 (3d Cir. 2000). Probable cause is assessed by

considering the arresting officer's knowledge "at the moment the arrest was made." Wright v.

City of Philadelphia, 409 F.3d 595, 602 (3d Cir. 2005). A district court may conclude "that

probable cause exists as a matter of law if the evidence, viewed most favorably to Plaintiff,

would not support a contrary factual finding" and enter summary judgment. Merkle, 113 F.3d at

788.

To challenge the validity of an affidavit of probable cause, a plaintiff must make a

two-pronged showing. Franks v. Delaware, 438 U.S. 154 (1978). The plaintiff must prove, by a

preponderance of the evidence, "(1) that the affiant knowingly or deliberately, or with a reckless

disregard for the truth, made false statements or omissions that create a falsehood in applying for

a warrant; and (2) that such statements or omissions are material, or necessary, to a finding of

probable cause." Sherwood v. Mulvihill, 113 F.3d 396, 399 (3d Cir. 1997) (citing Franks, 438

U.S. at 171-72). False statements are made with "reckless disregard for the truth" when an

affiant has "obvious reasons to doubt the truth of what he or she is asserting." Wilson v. Russo,

212 F.3d 781, 783 (3d Cir. 2000). Omissions are made with "reckless disregard for the truth"

when an affiant "recklessly omits facts that any reasonable person would know that a judge

would want to know." Wilson, 212 F.3d at 783. False statements or omissions are "material" if

a reconstructed affidavit, containing alleged omissions and excising alleged inaccuracies, would

no longer establish probable cause. Collins v. Christie, No. 08-3781, 2009 U.S. App. LEXIS

15462, at *16-17 (3d Cir. July 10, 2009) (citing Wilson, 212 F.3d at 789).

**NOT FOR PUBLICATION**

Defendants argue that any reasonable jury, even viewing all evidence in the light most favorable to the plaintiff, would find that Detective Long had probable cause to seek an arrest warrant.[1]  Defendants argue that, even without the recanted information from Mr. Bosma's October 14, 2003 statement, probable cause existed.  Defendants also argue that no reasonable jury could find that Detective Long required Mr. Bosma to provide false information, or knew that Mr. Bosma was doing so.

Plaintiff counters that a reasonable jury could find that Detective Long did not have probable cause to obtain an arrest warrant.  Plaintiff alleges that Detective Long forced Mr. Bosma to provide false information in his taped sworn statement by threatening to arrest him unless he provided certain information, even though Detective Long knew this information was false.  (Pl. Opp. at 7.)  In support of this allegation, Plaintiff relies upon the following testimony that Mr. Bosma gave at Plaintiff's 2005 criminal trial:

> Q.    [W]hen you arrived at the State Police station [on October 13, 2003], they gave you your Miranda warnings, isn't that right?
> A.    Yes.
> Q.    And, Detective Long was in your face, wasn't he?
> A.    Yes.
> Q.    And you kept saying, that's not what I saw, and he made you say what you said.  Isn't that right?
> A.    Yes.
> . . .

---

[1] Defendants further argue that the Court should grant their summary judgment motion on two other grounds:  (1) that a reasonable jury could not find that Detective Long acted "maliciously or for a purpose other than bringing the plaintiff to justice" in arresting Plaintiff, and (2) Defendant is entitled to qualified immunity. The Court need not consider these arguments because the Court finds that probable cause existed, which immunizes Defendants from Plaintiff's malicious prosecution claims.

**NOT FOR PUBLICATION**

> Q.    Didn't Detective Long say what – if you didn't say what he wanted you to
>        say, you were going to be arrested.  Isn't that right?
> A.    Yes
> . . .
> Q.    So, you were actually pressured in giving that statement, weren't you?
> A.    Yes, I was.

Pl. Ex. 1 at 32-34.

In further support of this allegation, Plaintiff points out that Detective Long's handwritten notes taken during his initial questioning of Mr. Bosma do not reference an alleged sexual assault.  Plaintiff argues that it "is inconceivable that Bosma is, on his own, telling Detective Long the elements of what Long classified as Bosma's offense of contributing to the delinquency of a minor by not stopping what he saw, and yet there is not a mention in the notes of what Bosma saw in the van."  (Pl. Opp'n at 9.)  Plaintiff suggests that Detective Long knew that the victim statement of K.A. was not enough to constitute probable cause because there were "five people in the van and nobody saw anything that she described in her statement. . . . Detective Long needed an eyewitness inside the van and he fabricated Bosma." (Pl. Opp'n at 10.)

Plaintiff also alleges that the affidavit submitted by Detective Long contained misstatements and omissions that undermine the validity of the affidavit.  In particular, Plaintiff points to the following: (1) the affidavit erroneously states that Mr. Bosma said in his October 13 taped sworn statement that Plaintiff "unzipped" his pants during the car ride home, whereas Mr. Bosma actually said that Plaintiff "pulled down" his pants.  Plaintiff alleges that Detective Long intentionally changed this language to make Mr. Bosma's fabricated story more believable; (2) the affidavit omits that the alleged victim's clothing was sent to the state police lab for

**NOT FOR PUBLICATION**

examination on October 15th; and (3) the affidavit omits that the state police lab found on

October 15 that none of Plaintiff's seminal fluid was detected on the victim's clothing.   Plaintiff

argues that, although Detective Long has testified that he did not learn of this negative finding

until after submitting his Affidavit, a jury could infer that the lab analysis was a "rush job," and

that Detective Long knew and intentionally suppressed the results.  (Pl. Opp'n at 7.)

As an initial matter, the Court is not convinced that a reasonable jury could

conclude, based upon the evidence in the record, that Defendant acted with "reckless disregard

for the truth" in making the alleged misstatements and omissions in the affidavit.  The Court

need not determine that issue, however, because the Court finds that the alleged misstatements

and omissions in the Affidavit are not "material."  A "reconstructed affidavit," constructed by

"inserting alleged omissions and excising alleged inaccuracies," would still establish probable

cause.  Collins, 2009 U.S. App. LEXIS 15462, at *16.   See also Morrison v. Schultz, 270 Fed.

Appx. 111, 118 (3d Cir. 2008) (finding that alleged errors and omissions were not material,

obviating the need to decide whether they were made with reckless disregard for the truth).

The reconstructed affidavit would state that Mr. Bosma said in his taped sworn

statement that he observed that Plaintiff "pulled down" his pants in the car, rather than

"unzipped" them.  This would not diminish probable cause at all.  The reconstructed affidavit

would also include that Plaintiff's pants were sent to the state police lab for testing and that the

lab did not detect Plaintiff's seminal fluids, and that Mr. Bosma recanted certain information in

his October 14 statement that he told investigating detectives was based on his own observations,

**NOT FOR PUBLICATION**

but was really information he learned from others. The inclusion of these facts in the reconstructed affidavit would not remove probable cause.

Probable cause would still exist as a matter of law even with a reconstructed affidavit because the facts and circumstances in the reconstructed affidavit would be "sufficient in themselves to warrant a reasonable person to believe" that Plaintiff had committed an act of sexual contact with the alleged victim. Merkle, 211 F.3d at 788. The affidavit would still note that, in a taped sworn statement, the victim provided a very detailed account of the alleged sexual assault to the police on October 13. She clearly identified Plaintiff as the individual who assaulted her during the day. Plaintiff acknowledged, when questioned by detectives on October 13, that he did not know of any problems that would lead the alleged victim to falsely accuse him of sexually assaulting her. In addition, the victim's stepmother told police on October 13 that (I) her daughter told her she was sexually assaulted by Plaintiff the previous day, and (ii) her stepdaughter's ten-year old friend confirmed seeing Plaintiff touching her stepdaughter inappropriately at the football game.

Moreover, one of Plaintiff's male friends at the game, Mr. Eagles, heard Plaintiff comment in the parking lot before the game that the alleged victim was "well-developed" for a thirteen-year old girl. Mr. Eagles also observed Plaintiff holding hands with the girl in the parking lot (which Mr. Eagles thought was "kind of odd") and place a towel on the girl's leg on the car ride home (which Mr. Eagles found to be "peculiar"). Similarly, Plaintiff's other male friend at the game, Mr. Bosma, heard Plaintiff comment on the thirteen-year old girl's breasts before the game. Mr. Bosma also observed Plaintiff holding hands with the girl during the day.

**NOT FOR PUBLICATION**

And Mr. Eagles and Mr. Bosma both confirmed that all the logistical arrangements that the alleged victim described that day – including the seating arrangements at the stadium and during the car ride home, and the time alone that Plaintiff spent with the girls before the game started and after the game ended – were correct.

      The sum total of these "facts and circumstances" that would have been available to Detective Long on October 15, 2003, are "sufficient in themselves" such that probable cause existed as a matter of law. <u>Merkle</u>, 211 F.3d at 788. Even adding the alleged excised material to the reconstructed affidavit would not "outweigh" these facts and circumstances such that probable cause would no longer exist. <u>Wilson</u>, F.3d at 790.

      The Court's finding is further supported by the grand jury's indictment of Plaintiff on April 14, 2005. <u>See Rose v. Bartle</u>, 871 F.2d 331, 551 (3d Cir. 1989) ("grand jury indictment or presentment constitutes prima facie evidence of probable cause to prosecute, . . . this prima facie evidence may be rebutted by evidence that the presentment was procured by fraud, perjury, or other corrupt means"). The grand jury knew about the negative lab result and that Mr. Bosma had recanted certain parts of his earlier testimony, and even so returned an indictment. (Def. Ex. 1, 2.) This further shows that the facts and circumstances available to Detective Long were sufficient to establish probable cause even had a reconstructed affidavit been submitted.

      Finally, although not necessary to its finding that probable cause existed, the Court finds that a reasonable jury could not conclude, even viewing all evidence in the light most favorable to the plaintiff, that Detective Long required Plaintiff to provide false information in

-21-

**NOT FOR PUBLICATION**

his October 13, 2003 statement, or knew he was doing so. Mr. Bosma gave the following

deposition testimony in this action, stating that Detective Long did not require him to give false

testimony or know he was doing so:

> Q. [D]id [the questioning detectives on October 14, 2003] move their eyes in a certain way; did they throw their shoulders; did they make hand gestures; did they lift their – anything at all – that was what you perceived to be a prompt on their part, a direction for you to give a false statement?
> A. Are you asking me if they did anything?
> Q. Yes.
> A. No, absolutely not.
> . . .
> Q. From the time of the sworn statement on October 14th to the three officers up until that [time] you recanted that statement . . . did you have any information or knowledge that any of those officers knew you were giving false information in that sworn statement on October 14th?
> A. No.
> . . .
> Q. They [the detectives] did not tell you what to say, did they?
> A. No.
> Q. And they didn't prompt you as to what to say either before you were sworn in or after you were sworn in, did they?
> A. No.
> . . .
> Q. Did you ever perceive . . . that they wanted you to testify in a false manner in order to aid in the arrest and conviction of Mr. Mobilio?
> A. No.
> Q. The choice to give false information, was that yours?
> A. Yes.

Ex. W at 54-56, 89-91. Even though Mr. Bosma's deposition testimony appears at odds with his

earlier 2005 testimony during Plaintiff's criminal trial, no reasonable jury could rely on the now-

disavowed 2005 testimony and find that Mr. Bosma was forced to make a false statement. Mr.

Bosma himself has now testified that this was not so.

NOT FOR PUBLICATION

**II.    Abuse of Process**

To prevail on an abuse of process claim under New Jersey, plaintiff must show "'(1) an ulterior motive and (2) some further act after an issuance of process representing the perversion of the legitimate use of the process.'" Fleming v. United Parcel Serv., Inc., 255 N.J. Super. 108, 157, 604 A.2d 657 (Law Div. 1992), aff'd, 273 N.J. Super. 526, 642 A.2d 1029 (App. Div. 1994), cert. denied, 138 N.J. 264, 649 A.2d 1285 (1995).

Detective Long has testified that his only interest during the investigation into the alleged sexual assault was to find out the truth.  Plaintiff has shown no evidence that Detective Long had any other motive.  As a result, there is no genuine factual dispute on this point.  In addition, because the Court finds that there is no evidence upon which a reasonable jury could find that Detective Long forced Mr. Bosma to give false testimony, there is no evidence that Defendant engaged in any act representing "the perversion of the legitimate use of the process." Fleming, 255 N.J. Super at 157.

The Court dismisses Plaintiff's abuse of process claim with prejudice.

**III.    Civil Rights Violations**

In count five of the Complaint, Plaintiff alleges that:

> As a result of the actions of Brian Long as set forth herein in detail, the Plaintiff's rights were violated in that his right to travel was restricted, his right to contact certain other persons was limited, he was incarcerated, he was required to appear in the Superior Court of New Jersey on many occasions, he was required to stand trial and his right to employment was suspended due to the actions of Brian Long as specifically defined herein.

**NOT FOR PUBLICATION**

(Compl. ¶ 56.) In its June 7, 2008 Order, the Court held that Plaintiff did not allege any additional facts in count five than those already alleged in counts one through four, and that Plaintiff failed to meet the Supreme Court's requirement to "identify the specific constitutional right allegedly infringed." Albright v. Oliver, 510 U.S. 266, 271 (1994). The Court dismissed Count Five without prejudice and noted that Plaintiff could seek leave to amend if it deemed it feasible to do so.

Plaintiff has not sought leave to amend and Count Five still does not give Defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests." Conley v. Gibson, 355 U.S. 41, 47 (1957). Plaintiff's request to reinstate Count Five is denied.

**IV.    Emotional Distress**

Plaintiff alleges that "[a]s a result of the consequences of the actions of Brian Long, the Plaintiff suffered emotional distress, which had a debilitating effect upon him." (Compl. ¶ 60.) Under New Jersey law, "to establish a claim for intentional infliction of emotional distress, the plaintiff must establish intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe." Buckley v. Trenton Saving Fund Soc., 111 N.J. 355, 366 (1988).

As discussed, Plaintiff cannot show that Detective Long engaged in any "intentional and outrageous" conduct because Detective Long had probable cause to seek an arrest warrant. Count Six is dismissed with prejudice.

**NOT FOR PUBLICATION**

## <u>CONCLUSION</u>

The Court grants Defendants' summary judgment motion and dismisses the remaining claims in Plaintiff's complaint with prejudice. The Court denies Plaintiff's request to reinstate Count Five.


September 14, 2009                                         <u>s/William H. Walls</u>

                                                United States Senior District Judge

-25-